## AFFIDAVIT IN SUPPORT OF
## APPLICATIONS FOR SEARCH WARRANTS

I, Ann Marie Phillippi, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of applications for search warrants for information associated with the following email accounts:

- **brotherwholesaleorders@gmail.com**
- **brotherswsorders@gmail.com,**
- **brotherswsfinance@gmail.com,**
- **puritybrokers@gmail.com,**
- **devrajwholesale@gmail.com, and**
- **dharma65@gmail.com,**

which information is stored at premises owned, maintained, controlled, or operated by Google, Inc., an e-mail provider headquartered at Google Legal Investigations Support, 1600 Amphitheatre Parkway, Mountain View, California, 94043. The information to be searched is described in the following paragraphs and in Attachment A. These applications seek search warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google, Inc., to disclose to the United States copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.    I am employed as a detective for the City of West Allis Police Department and have been a law enforcement officer for over 23 years. I have been a detective for over 12 years.

I have been assigned to the United States Department of Justice, Drug Enforcement Administration (DEA), as a Federally Deputized Task Force Agent, for over four years. During this time, I have investigated almost exclusively controlled substances offenses, including offenses committed in violation of Title 21, United States Code, §§ 802(32), 813, 841(a)(1), 846. I have also investigated money laundering offenses committed in violation of Title 18, United States Code, §§ 1956 and 1957.

3.     As part of my employment, I have received specialized training in the investigation of suspected federal narcotics violations, including, but not limited to training in: drug identification, the use of informants, undercover operations, search warrant procedures, and techniques used to investigate individuals and organizations involved in the illegal manufacture and sale of controlled substances.

4.     I have personally participated in many criminal investigations related to the suspected trafficking in controlled substances, such as cocaine, marijuana, as well as various types of "designer" or synthetic drugs, such as synthetic cathinone (also known as "bath salts") and synthetic cannabinoid compounds and products, which sometimes go by the street names "Spice" or "K2." I know that many of these synthetic cannabanoid chemical compounds have been designated as a Schedule I controlled substance and that others constitute an analogue of a Schedule I controlled substances under Title 21 U.S.C. § 802(32), when they are intended for human consumption and have both a chemical structure that is substantially similar to, and a pharmacological effect that is substantially similar to or greater than, the analogous Schedule I controlled substance.

2

5.     I have also participated in the execution of numerous search warrants, which resulted in the seizure of controlled substances and items of evidence later used in criminal prosecutions. The places I have searched pursuant to warrants have included residences of targets and their associates and relatives, "stash houses" (houses used as drug/money storage locations), storage facilities, businesses, as well as computers and telephones. The evidence I have recovered during the execution of search warrants at these locations has including controlled substances, financial records relating to purchase and sale of controlled substances and expenditures of profits earned from the sale of controlled substances, monetary instruments, receipts for assets purchased with drug proceeds, as well as data and images from computers, cell phones, and smart phones relating to drug trafficking activity.

6.     Furthermore, during the course of my employment, I have had numerous discussions with other experienced law enforcement officers, and have conducted and participated in many interviews of admitted narcotics traffickers and cooperating defendants concerning how drug traffickers and money launderers operate.

7.     To date, this investigation has included traditional law enforcement methods, including, but not limited to, interviews with confidential informants and sources; issuing subpoenas; gathering and analyzing information from other law enforcement agencies, documentary evidence, telephone toll data, and financial records; conducting physical surveillance; and making controlled purchases of narcotics.

8.     All the information contained in this affidavit is derived from my own knowledge and observations, from information provided by witnesses, from other law enforcement officers, and from third-party records. I believe this information to be both truthful and reliable.

3

9. Because I am submitting this affidavit for the limited purpose of requesting search warrants, I have not included each and every fact I know about this investigation. Rather, I have set forth only the facts that I believe are necessary to establish probable cause for issuance of the requested search warrants.

10. Based on my training and experience and the facts as set forth in this affidavit, I submit that there exists probable cause to believe that JOHN WILHOITE , AMY WIHOITE, Alec TUNDIDOR, Christopher "Brett" HINTON, Jia ZOU, Steve SANDERS, Shane SANDERS, Dev PATEL, and the following businesses that these individuals run, either jointly or individually – DS APPLICATIONS, J & B PACKAGING, J & B APPLICATIONS, DEEP SOUTH INCENSE, S & S WHOLESALE, SYNERGY BOTANICALS, PURITY BROKERS, BROTHERS WHOLESALE, 6 DEGREES MARKETING, CHEMDUSTRY, ALEC NICHOLAS CONSULTING, PACKAGING INC, DEVRAJ WHOLESALE and SUPER WHOLESALE – have engaged in violations of Title 21 U.S.C. §§ 841, 846, 813 (possession with intent to distribute a controlled substance, conspiracy to distribute a controlled substance, controlled substance analogues) 21 U.S.C. § 331 (introduction or delivery into interstate commerce of any drug that is adulterated or misbranded), and 18 U.S.C. § 1956 (money laundering by conducting financial transactions to promote, or conceal the proceeds of, illegal narcotics activity). I submit that there also exists probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## JURISDICTION

11. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) &

4

(c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has

jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## APPLICABLE STATUTUES

### Controlled Substance Analogue Enforcement Act of 1986

12. In 1986, the Controlled Substances Act ("CSA") was amended by the Controlled

Substance Analogue Enforcement Act. This amendment added 21 U.S.C. § 813, which provides:

"A controlled substance analogue shall, to the extent intended for human consumption, be

treated, for the purposes of any Federal law as a controlled substance in schedule I."

13. The term "controlled substance analogue" is defined, in 21 U.S.C. § 802(32)(A),

to be a substance which:

> (1) has a chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II; and
>
> (2) has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or
>
> (3) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

### Emergency Scheduling of Synthetic Cannabinoid Compounds

14. On March 1, 2011, the Drug Enforcement Administration emergency scheduled

five synthetic cannabinoid compounds. The synthetic cannabinoid compounds that were

scheduled were: JWH-018; JWH-073; JWH-200; CP-47, 497 C8 homologue; and 47, 497

5

cannabicyclohexanol. On February 29, 2012, this emergency scheduling was extended until August 29, 2012.

## The Synthetic Drug Abuse Prevention Act of 2012

15. On July 9, 2012, the Synthetic Drug Abuse Prevention Act of 2012 was signed into law by President Obama. The act permanently added JWH-018 and AM-2201 as Schedule I controlled substances under Title 21.

## Applicable money laundering statutes

16. Title 18, U.S.C. §§ 1956(c)(7)(A) and 1961(1)(D), define violations of 21 U.S.C. §§ 841 and 846 as "specified unlawful activities" for the purposes of money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

17. Engaging in a conspiracy to commit money laundering is a violation of 18 U.S.C. § 1956(h). Based on my training and experience, I know that a conspiracy is an ongoing offense and that a conspiracy often involves one or more overt acts in furtherance of the conspiracy, even though section 1956(h) does not require proof of such an overt act.

## FACTS SUPPORTING FINDING OF PROBABLE CAUSE

### Synthetic cannabinoids

18. In this affidavit, I use the common short names for the synthetic cannabinoid compounds ("SC compounds") referenced herein. The following are the full chemical names for the SC compounds referenced in this affidavit:

a. AM-2201: 1-(5-Fluoropentyl)-3-(1-naphthoyl)indole

6

b.      JWH-018: 1-pentyl-3-(1-naphthoyl)indole

c.      JWH-210: 1-Pentyl-3-(4-ethyl-1-na naphthoyl)indole

d.      UR-144: 1-Pentyl-3-(2,2,3,3-tetramethylcyclopropoyl)indole

e.      5F-UR-144: 1-(5-Fluoropentyl)-3-(2,2,3,3-tetramethylcyclopropoyl) indole, also known as XLR-11.

19.      Based on my training and experience, I know that, in recent years, individuals have begun to manufacture and traffic in smokable synthetic cannabinoid products ("SSC products"), of which two of the past popular brand names were "Spice" and "K2." SSC products are a mixture of an organic carrier medium, such as the herb-like substance Damiana, which is then mixed with one or more synthetic cannabinoid compounds ("SC compounds"), which share pharmacological similarities with tetrahydrocannabinol ("THC"), the psychoactive ingredient in marijuana.

20.      Hundreds of types of SC compounds exist, of which five – JWH-018; JWH-073; JWH-200; CP-47,497; and CP-47-497 C8 homologue – were designated as Schedule I controlled substances on March 1, 2011, through the Drug Enforcement Administration's emergency scheduling authority under 21 U.S.C. § 811(h)(2).[1]  On February 29, 2012, this emergency scheduling was extended until August 29, 2012.[2]  On July 9, 2012, President Obama signed into law new drug legislation that formally banned these five SC compounds and several others, such as AM2201 (which DEA had previously considered to be an analogue of JWH-018), as well as variants of certain compounds.

---

[1] 76 Fed. Reg. 11,075 (Mar. 1, 2011).

[2] 77 Fed. Reg. 12,201 (Feb. 29, 2012).

7

21. In an attempt to circumvent federal and state laws that designated various SC compounds as controlled substances, SC manufacturers and traffickers began manufacturing and distributing SC compounds that varied slightly from the scheduled compounds and SSC products that contained such slightly varied SC compounds.

22. SSC products are commonly sold in head shops, tobacco shops, convenience stores, adult stores, and over the Internet.

23. SSC products are often marketed as incense, potpourri, or "fake weed," and the SSC product packaging often bears the disclaimer that the product is "not for human consumption." Distributors of these SSC products use such product names and markings to suggest that the SSC product is not intended to be smoked and, thereby, to avoid having the SSC products identified as containing a controlled substance analogue of one or more Schedule I controlled synthetic cannabinoids and, in addition, to avoid having the SSC products classified as a drug that would be subject to the Federal Food and Drug Administration (FDA) testing and approval process.

24. Users of these SSC products have reported intense hallucinogenic effects including, but not limited to, paranoia, panic attacks, increased heart rate, hallucinations, and increased blood pressure.

25. Based upon my training and experience, I further know that DEA considers the synthetic cannabinoids:

- 1-Pentyl-3-(4-ethyl-1-na naphthoyl)indole ("JWH-210")
- 1-Pentyl-3-(2,2,3,3-tetramethylcyclopropoyl)indole ("UR-144"), and

8

- 1-(5-Fluoropentyl)-3-(2,2,3,3-tetramethylcyclopropoyl)indole ("XLR-11," also known as 5FUR-144),

to be controlled substance analogues of the Schedule I controlled substance JWH-018, under 21 U.S.C. § 802(32), because DEA has found JWH-210, UR-144 and XLR-11 to have a chemical structure substantially similar to, and to cause pharmacological effects substantially similar to, the Schedule I controlled substance JWH-018. Therefore, when intended for human consumption, DEA treats JWH-210, UR-144, and XLR-11 as if they are Schedule I controlled substances under 21 U.S.C. § 813.

26.    In addition, as noted above, the DEA considered AM2201 to be a controlled substance analogue of JWH-018, under Title 21 U.S.C. § 802(32), before AM2201 became a Schedule I controlled substance on July 9, 2012.

## Common practices of drug traffickers

27.    Based upon my training and experience, I know the following about drug trafficking generally:

a.    Persons involved in large-scale drug trafficking typically keep records of their drug purchases and drug sales. For example, they often keep ledgers, in paper form, in their residences and business, of their drug inventory purchases and their drug sales. Drug dealers also frequently communicate with their drug suppliers, other coconspirators, and drug customers via phone calls, text messages, and/or email messages using email accounts with a major email provider, such as Gmail.

b.    Drug traffickers often deal in large sums of money. They also often conduct business in cash to avoid drawing attention to their illegal drug dealing.

c.    Drug traffickers often promote their drug-trafficking operation by using proceeds of completed drug sales to buy more drugs for future sales.

9

d.    Drug traffickers also often use drug proceeds to buy expensive personal items, such as real estate, automobiles, watercraft, and jewelry.

e.    Drug traffickers often have photographs or video taken of themselves, their associates, their product, and property items that they have bought with their drug proceeds. Traffickers sometimes post these photos online on their own websites or on social media sites, such as Facebook, and sometimes email such photos to friends and associates.

f.    Drug traffickers often engage in money laundering transactions to make their drug proceeds look legitimate by concealing the nature, source, location, or true ownership of the proceeds. For example, drug traffickers often form, use, or associate with fictitious business entities, also known as "fronts," or even legitimate businesses that generate large quantities of cash. Drug traffickers often launder their drug proceeds through such fictitious or actual businesses by depositing their drug proceeds into one or more accounts held in the name of the business to make those deposits appear to be legitimate deposits of business revenues.

g.    Relatedly, drug traffickers often also engage in money laundering when buying assets with their drug proceeds. They frequently do so by buying or titling such drug-derived assets using an alias or the name of a friend, relative, or a front business, all for the purpose of concealing that the asset belongs to the trafficker and was bought with drug proceeds.

h.    Drug traffickers sometimes open checking accounts at financial institutions that have numerous branches throughout the United States. They then instruct their customers to deposit cash into these accounts as payment for drugs. This approach allows the drug trafficker to be paid without having the drug money transported to them and, in many instances, without the bank verifying the identity of the depositor.

i.    Drug traffickers and money launderers commonly keep records, either in paper or electronic media, of their drug sales and money laundering activities. Drug traffickers and money launderers often retain such financial records, unlike the drugs themselves, for long periods of time.

10

j.  Drug traffickers sometimes have financial statements of accounts that they own or control sent to an email address that the drug trafficker uses or to which the drug trafficker has access.

k.  Drug traffickers frequently communicate with suppliers, customers, drug-dealing associates, and persons who launder money for the traffickers via phone calls, voice mail messages, email messages, and text messages.

l.  Drug traffickers sometimes continue to operate a drug conspiracy, or to communicate about and in furtherance of the conspiracy with coconspirators, or both, even after the traffickers learn that the conspiracy has been detected by law enforcement.

#### Common practices of traffickers in smokable synthetic cannabinoids

28.  Based upon my training and experience, I know the following about trafficking in synthetic cannabinoids:

a.  One particular danger posed by SSC products is that the end distributor is often a "brick and mortar" retailer that markets its wares to the public. Selling SSC through legitimate retailers gives SSC manufacturers and distributors a seemingly legitimate avenue to sell, and buyers a seemingly legitimate avenue to buy, these compounds that usually contain analogues of Schedule I controlled substances, and that can be dangerous to the user's health.

b.  Based upon interviews with members of, as well as evidence seized from, SSC manufacturers, I know that SSC manufacturers routinely track what SC compounds are added to, or are pending addition to, federal Schedule I and state controlled substance laws. I also know that, as those compounds are scheduled, SSC manufacturers routinely reformulate their SSC products to contain an SC compound that is intended to produce the same type of high as the recently scheduled compound. In addition, interviews with SSC manufacturers revealed that their Chinese chemical sources of supply also routinely tracked what SC compounds are added to, or are pending addition to both federal Schedule I and state controlled substance laws, and would recommend using new SC compounds that were similar to the SC compounds that had recently been scheduled or were pending scheduling. Furthermore, I know from interactions with SSC

11

manufacturers that they and their employees routinely represented that such new SC compounds that the SSC manufacturers were using in their newly reformulated SSC products had the same or similar physiological effect as the SC compounds that had recently been scheduled or were pending scheduling. I submit that it is therefore fair and appropriate to infer that at least those members of the conspiracy who made such representations that the new SC compound created a physiological effects similar to that created by a recently scheduled controlled SC compound had knowledge that the new SC compound had a chemical structure substantially similar to that of the recently scheduled controlled SC compound. *See United States v. Turcotte*, 405 F.3d 515, 527 (7th Cir. 2005).

c.   To make the SSC products appear legitimate, SSC manufacturers and distributors often hire private laboratories to create "does not contain" reports, which specify certain controlled substances that are *not* contained within the SSC product, even though the SSC product might in fact contain other illegal controlled substances or controlled substance analogues. The SSC manufacturers and distributors use such "does not contain" reports to make the SSC product appear to be in compliance with existing state and federal controlled substance laws, even when the SSC product in fact usually contains one or more analogues of a Schedule I controlled substance. The SSC manufacturers and distributors often provide such "does not contain" reports to retail-level SSC sellers to help retail sellers make a plausible argument to law enforcement agents that the retail seller was unaware that the SSC product contained any controlled substances or controlled substance analogues. SSC manufacturers and distributors thus sometimes use such "does not contain" letters to thwart law enforcement efforts to enforce laws criminalizing synthetic drugs.

d.   I know that SSC manufacturers and distributors often obtain a "does contain" report that details the chemicals present in their products. But SSC manufacturers and distributors typically do not provide such "does contain" reports to SSC retailers.

e.   Furthermore, I know that some SSC manufacturers and distributors have attorneys submit SSC samples to laboratories for analysis on behalf of the SSC manufacturer or distributor, so that if the lab records are subpoenaed or if law enforcement gets a copy of the report, the manufacturer's or

12

distributor's name and identifying information will not be printed on it. I submit that the reason why such SSC manufacturers have attorneys submit the sample to the lab is to conceal the true identity of the manufacturer. I further submit that this practice thereby demonstrates the manufacturer's knowledge that the manufacture and distribution of SSC products intended for human consumption is illegal. Attorneys also provide some SSC manufacturer and distributor clients with letters opining that the SSC product at issue does not violate the law of a particular state, even when the SSC product contains an analogue of a federally controlled substance, as a further way of making the SSC product at issue appear legal when it in fact is not.

f.     I submit that SSC manufacturers and distributors who obtain and distribute such "does not contain" reports stating that a particular SSC product does not contain certain controlled substances – when the SSC product does in fact usually contain one or more analogues of Schedule I controlled substances – demonstrate their knowledge of the fact that the SSC product they are selling is a controlled substance when intended for human consumption.

g.     Retail stores that sell SSC products often sell those products in a clandestine manner by, for example, keeping those products out of public view – even though such SSC products are typically one of the most profitable items such retails stores have for sale. Likewise, such stores often limit their sales of SSC products only to customers they know in order to avoid selling SSC product – which they know or strongly suspect is illegal – to a confidential informant or an undercover law enforcement officer.

h.     Manufacturers and distributors of SSC products frequently travel to China, Taiwan, and Hong Kong in order to obtain SC compounds, which are usually considered analogues of Schedule I controlled substances, and to obtain material used to package SSC products. Such SSC traffickers often also have SC compounds, some of which are considered analogues of Schedule I controlled substances, and packaging materials delivered to them or their agents via commercial carriers, such as United Parcel Service (UPS) and Federal Express (FedEx). SSC traffickers sometimes receive such shipments at commercial mail box locations, such as UPS

13

stores. SSC traffickers often also use commercial carriers to deliver SSC products for them.

i. SSC traffickers sometimes have records documenting their travel to obtain SC chemicals, and records documenting their use of commercial carriers to receive shipments of SC chemicals and to send out finished SSC product, emailed to the traffickers' email addresses.

j. Drug traffickers who deal in SSCs usually used email accounts to email invoices and shipping information to customers, as well as to communicate with their SC compound suppliers.

**The conspiracy to distribute SSC products containing analogues of Schedule I controlled substance JWH-018 involving John Wilhoite, Amy Wilhoite, Alec Tundidor, "Brett" Hinton, Jia Zou, Steve Sanders, Shane Sanders, Dev Patel, and others**

29. The facts establishing probable cause for the requested search warrants are derived from an investigation that has focused on JOHN WILHOITE , AMY WIHOITE, Alec TUNDIDOR, Christopher "Brett" HINTON, Jia ZOU, Steve SANDERS, Shane SANDERS, Dev PATEL, and the following businesses that these individuals run, either jointly or individually – DS APPLICATIONS, J & B PACKAGING, J & B APPLICATIONS, DEEP SOUTH INCENSE, S & S WHOLESALE, SYNERGY BOTANICALS, PURITY BROKERS, BROTHERS WHOLESALE, 6 DEGREES MARKETING, CHEMDUSTRY, ALEC NICHOLAS CONSULTING, PACKAGING INC, DEVRAJ WHOLESALE and SUPER WHOLESALE.

30. For the reasons set forth below, I submit that there exists probable cause to believe that, between on or about March 1, 2011 and at least September 19, 2012, the above-named individuals and businesses conspired to intentionally procure and distribute SC

14

compounds and to intentionally manufacture, distribute, and sell SSC products, throughout the United States, including the Eastern District of Wisconsin, that contained, and which they then knew to contain, controlled substance analogues of a Schedule I controlled substance, JWH-018.

31.     The SSC products that the coconspirators manufactured, distributed, and sold had the following brand names: MR. HAPPY, MR. NICE GUY, G-13, G-20, ATOMIC, DANK, CALIFORNIA DREAMS, GUERILLA WARFARE, KOOL BREEZE and TROPICAL BREEZE.

32.     Although the above-named businesses have distinct entity names, principals, and accounts at financial institutions, agents found that they operate under the umbrella of DS APPLICATIONS/SYNERGY BOTANICALS, which primarily marketed its SSC products on a website, WWW.BUY-HERBAL-INCENSE.COM.

33.     Although these SSC products were intended to be smoked so that the user could get high, the products were typically labeled "not for human consumption," as a part of the targets' efforts to evade federal narcotics and Food and Drug Administration (FDA) laws.

34.     As part of this investigation, agents have ordered SSC products containing what DEA considers to be analogues of a Schedule I controlled substance from principals of the conspiracy via undercover purchases, which those conspirators caused to be delivered to the Eastern District of Wisconsin.

35.     During the execution of search warrants and during licensing compliance checks at businesses located in the Eastern District of Wisconsin, agents have also seized such SSC

15

products containing what DEA considers to be analogues of a Schedule I controlled substance that were manufactured as part of this conspiracy.

36.     Samples of SSC products that DEA obtained through the execution of search warrants and a consent search on February 1, 2012, were analyzed by the DEA North Central Lab, and were found to contain the synthetic cannabinoid AM2201, which DEA then considered an analogue of JWH-018 under 21 U.S.C. § 802(32) and which, since July 9, 2012, has been scheduled as a Schedule I controlled substance. These samples also contained the synthetic cannabinoid JWH-210, which DEA then and now considers to be an analogue of the schedule I controlled substance JWH-018 under 21 U.S.C. § 802(32) because JWH-210 has a substantially similar chemical structure to, and a substantially similar pharmacological effect as, JWH-018.

37.     The DEA North Central Lab also analyzed the SSC products obtained through an undercover purchase in May 2012. These SSC products were also found to contain synthetic cannabinoids UR-144 and XLR-11 (5FUR-144), each of which DEA then and now considers to be an analogue of JWH-018 under 21 U.S.C. § 802(32) because UR-144 and XLR-11 each have a substantially similar chemical structure as well as a substantially similar pharmacological effect as the schedule I controlled substance JWH-018. The analysis of the SSC products obtained through an undercover purchase in July 2012 is still pending.

38.     Financial records obtained in the course of this investigation indicate that the targets earned most or all their proceeds from importing and selling SC compounds and damiana (the carrying agent used in the manufacture of SSC products), making and selling SSC products containing one or more controlled substance analogues of a Schedule I controlled substance, or both. The investigation has further revealed that the targets generated sales through their

16

websites and by making direct sales to established customers, and that the targets then transferred the proceeds of these sales to various bank accounts held in the names of different individuals and entities.

39.    In particular, I know, from information other law enforcement officers and I obtained at trade shows and from DS APPLICATIONS/SYNERGY BOTANICALS' website and posted on the companies' Facebook and Twitter pages, that DS APPLICATIONS and SYNERGY BOTANICALS have no legitimate products or sources of revenue and that their sales revenues have been derived solely from the manufacturing, distribution, and sale of SC compounds and SSC products containing analogues of Schedule I controlled substances, and other products that contain substances meant for human consumption, in violation of DEA and FDA laws.

**February 2012 investigation of SSC product wholesaler Bassam Abu-Shawish in Milwaukee, Wisconsin**

40.    This investigation began on Sunday, January 15, 2012, when a City of Milwaukee, Wisconsin police officer saw a subject driving erratically on S. Chase Ave. near W. Oklahoma Avenue. The officer, who was on his way to work, called 911 to request a squad for a traffic stop, but continued to follow the vehicle as it pulled into the Petro Mart Chase, LLC, d/b/a Petro Mart or AK Petro Mart gas station at 2341 S. Chase Avenue. The officer saw the subject get out of his vehicle, enter the AK Petro Mart, and less than a minute later, leave the store and get back into his vehicle. The officer then approached the subject, identified himself as a police officer, and ordered the subject not to drive away. While doing so, the officer saw a blue and white glass pipe, commonly used for smoking drugs, on the subject's lap, along with an

17

opened foil package of a product called "Mr. Happy." The subject was arrested and agreed to talk to officers about the Mr. Happy product.

41. The subject stated that, every day recently, he had been driving to this gas station, located about five miles from his home, to buy Mr. Happy. The subject further stated that AK Petro Mart charged $24 for 4 gram packets, and $11 for 1 gram packets of Mr. Happy, and sold other brands as well including G-13 and Dank. According to the subject, the products are not displayed in the open and instead, are kept hidden under the counter, just below the register. The subject claimed that he had also sent friends into AK Petro Mart to buy Mr. Happy but that the store had refused to sell Mr. Happy to them. The subject stated that he believed that AK Petro Mart employees sold SSC products only to customers they knew and trusted. The subject added stated that he packed the Mr. Happy product into his bowl (glass marijuana pipe), and smoked it like marijuana, and that Mr. Happy, and other SSC products, get him as high or higher than marijuana. But the subject noted that the SSC products, unlike marijuana, would not cause the user to test positive for drug usage when subjected to a urine screen. The subject stated that this was important to him because he is under probation/parole supervision.

42. The Mr. Happy product seized on January 15, 2012, was conveyed to the State of Wisconsin Regional Crime Lab (WRCL) for analysis. A January 20, 2012, the lab reported that the Mr. Happy sample had tested positive for the presence of SC compound AM2201, which is now a Schedule I controlled substance, and JWH-210, both of which DEA then and now considers to be an analogue of the Schedule I controlled substance JWH-018.

43. On January 24 and January 25, 2012, City of Milwaukee police officers conducted a series of undercover purchases of 1.5 gram and 4 gram quantities of Mr. Happy and

18

Mr. Nice Guy SSCs from three Milwaukee gas stations and businesses: AK Petro Mart, Best Petro, and Mitchell Petro Mart. Samples of the SSCs purchased were then submitted to the WRCL for testing. The WRCL found that the samples contained the SC compounds AM2201 and JWH-210.

44. On February 1, 2012, the Milwaukee Police Department and DEA-Milwaukee executed search warrants at these businesses, and recovered the following quantities and weights of SSCs:

      a. AK Petro Mart: 733 items, weighing 2,095 grams, with a retail value of $11,398;

      b. Best Petro: 59 items, weighing 173 grams, with a retail value of $1,116; and

      c. Mitchell Petro Mart: 1,158 items, weighing 2,882 grams, with a retail value of $18,576.

45. Most of the seized SSC products consisted of the following brand names: Mr. Happy, Mr. Nice Guy, G-13, G-20, Wicked, Dank, Atomic, and California Dreams. Sales receipts for SSCs located at all three business locations listed the same supplier for SSC products: "Bassam" of B & A Wholesale LLC. Per AT&T records, the subscriber of record for this business is Bassam Abu-Shawish of 9502 W. Beloit Road, Milwaukee, Wisconsin.

46. Milwaukee police officers executed a state search warrant at Abu-Shawish's residence at XX02 W. Beloit Road on February 1, 2012. From that residence and a vehicle, officers seized more than 3,000 pieces of SSC product that weighed over 7,800 grams. Officers also seized a RESEARCH TRIANGLE PARK LABS analysis reports for the SSCs, as well as

19

paperwork detailing orders for, payment for, and sales of SSC products by Bassam Abu-Shawish and his wife, Ashley Abu-Shawish.

47. Bassam Abu-Shawish also signed a DEA consent to search form for his storage units located at Armour Self Storage, 999 W. Mount Vernon Avenue, Milwaukee. There, agents seized in excess of 18,000 pieces of SSC product, weighing over 40,000 grams as well as boxes, invoices, packing slips and other items that showed that Abu-Shawish and his wife, d/b/a "B & A Wholesale LLC," were receiving thousands of pieces of SSC product from the following manufacturers and distributors:

> a. Steve SANDERS, d/b/a S & S WHOLESALE LLC; 445 Lake Street, Private Mail Box #207, Lake Charles, LA 70605; email: STEVE@BUY-HERBAL-INCENSE.COM; website: WWW.BUY-HERBAL-INCENSE.COM; dates listed on seized invoices were 09-07-2011(2), 09-26-2011, 09-27-2011(2), 10-18-2011, 11-23-2011, and 12-21-2011;
>
> b. Dev PATEL, d/b/a DEVRAJ WHOLESALE; 361 Meeler Circle, Bogart, GA 30622; phone: 404-654-0640; phone: 843-224-4740; UPS account #51W7A4;
>
> c. DS APPLICATION; 9931 Harwin Drive, #157, Houston, TX; dates listed on seized invoices were 05-30-2011, 08-11-2011, and 08-29-2011; and
>
> d. DS APPLICATION; 17093 Green Drive, Industry CA 91745; dates listed on seized FedEx shipping slips were 09-28-2011 and 10-03-2011.

In total, agents seized 27,315 individual SSC products, with a total weight of 54,059 grams, or approximately 119 pounds, with a retail value of approximately $368,886.

48. Law enforcement reviewed the documents seized on February 1, 2012, from the Abu-Shawish residence and storage unit and found the following items pertaining to SSC purchases made by Bassam Abu-Shawish and his wife and payments for those purchases:

> a. An email dated September 7, 2011, from Abu-Shawish's email, bnawholesale@yahoo.com to Steve SANDERS at email steve@buy-

20

herbal-incense, in which Abu Shawish placed his order for SSC product and listed the synthetic cannabinoid compound JWH-250 as a compound he needs listed as "not detected" on a "does not contain" lab report. He also requests a letter from attorney as it pertains to Wisconsin laws.

b. A letter from Lyman Law Firm LLC, 701 North St., Baton Rouge, LA, dated September 9, 2011. This letter was addressed to S & S WHOLESALE OF LAKE CHARLES LLC and DS APPLICATIONS LLC, and purported to be a legal review of Wisconsin Statute § 961.14 of the Wisconsin Uniform Controlled Substances Act and the alleged compliance of the following products with Wisconsin law: Atomic, California Dreams, Dank, G-13, Wicked, G-20, G-7, G-10, Mr. Happy Second Generation, and Mr. Nice Guy Second Generation. The letter was purported to have been signed by Crosby C. LYMAN, and did not contain any opinion regarding the compliance of the products with federal laws.

c. Two copies of a Research Triangle Park Laboratories report dated September 14, 2011, were located for the following SSC brands: G-13, Mr. Nice Guy, Mr. Happy, Dank, California Dreams, G-20, Atomic, G-10, G-7, Wicked Blue, and Wicked Red in the Abu-Shawish residence. The report listed DEEP SOUTH, Houston, TX, as the company that submitted the samples for testing on August 29, 2011. I noted that JWH-250 was listed as "not-detected," apparently in response to Abu-Shawish's above-referenced September 7, 2011 request for such a "does not contain" report.

49.    Invoices, packing slips, email messages and other items seized from the Abu-Shawishes' residence and storage unit on February 1, 2012, revealed that the Abu-Shawishes had purchased thousands of items of SSC product from the following businesses: DS APPLICATIONS, S&S WHOLESALE, and DEVRAJ WHOLESALE.

50.    Based upon information obtained in this investigation, it appears that S&S WHOLESALE and DEVRAJ WHOLESALE had, in turn, purchased SSC products from DS APPLICATIONS, and accordingly, that DS APPLICATIONS was the ultimate supplier of most or all of the Abu-Shawishes' inventory of SSC products.

51.    That DS APPLICATIONS was the ultimate supplier of most or all of the Abu-Shawishes' inventory of SSC products conclusion follows from the fact that each of the brands

21

of SSC products seized from the Abu-Shawishes had the name of the website "WWW.BUY-HERBAL-INCENSE.COM" as well as "Distributed by S & S WHOLESALERS" printed on the back of the product. The original phone number listed on the BUY-HERBAL-INCENSE.COM website, which Bassam Abu-Shawish regularly called, was subscribed to by S & A DISTRIBUTORS, at Steve and Shane SANDERS' former address: 2401 W. Prien Lake Rd., Lake Charles, Louisiana.

52. A Lexis-Nexis Accurint report run on June 20, 2012, listed Steve SANDERS as a principal for S & A DISTRIBUTION in Lake Charles, LA, as well as a principal in S & A INVESTMENTS/U PAK IT in Lake Charles, LA. Likewise, Calcascieu Parish Assessor's Office records list Steve SANDERS as being the recipient/owner of both properties at the time 2011 property tax statements were issued.

53. Agents found that Ashley Abu-Shawish had issued a check on January 20, 2012, on the Chase Bank account of B&A Wholesale to Steve SANDERS of S&S WHOLESALE LLC in the amount of $6,000, which is consistent with payment for SSC product. Agents further found that Bassam Abu-Shawish and his wife had withdrawn $33,025 in four transactions over a three- day period, January 25 to 27, 2012, from their B&A Wholesale account and had converted the monies withdrawn to cashiers' checks, made payable to DEVRAJ WHOLESALE. In addition, in Abu-Shawish's storage unit, agents located shipping labels and an invoice, which listed the sender as Dev PATEL and/or DEVRAJ WHOLESALE, 361 Meeler Circle, Bogart, GA 30622. A review of these labels revealed that between January 19 and 31, 2012, Abu-Shawish received approximately seven shipments from Dev Patel or DEVRAJ WHOLESALE weighing in excess of 170 pounds. One of the labels confirmed that the shipment specifically contained SSC product.

22

54.     Agents ran the address of 361 Meeler Circle, Bogart, GA 30622, as well as the

name Dev PATEL and the business name, DEVRAJ WHOLESALE, through Lexis-Nexis

Accurint for Law Enforcement, as well as through open source databases. DEVRAJ

WHOLESALE was registered as a corporation in the State of South Carolina on December 1,

2011 by Divyesh PATEL, with a business address of 1200 Woodruff Road, Suite A1, Greenville,

South Carolina, which is approximately a one-hour drive from Bogart, Georgia. Records for

UPS account #51W7A4, which was listed on each of the shipping labels containing Mr. Happy

brands of SSCs shipped to Abu-Shawish, show that the account was opened on January 24, 2012,

by Josh PATEL of 361 Meeler Circle, Bogart, GA 30622. According to records, this same

account number was opened on February 17, 2010, by SUPER WHOLESALE, at that same

address in Bogart, GA. The President/CEO listed in UPS records for SUPER WHOLESALE is

Raj DHARMENDRA.

## February, 2012 Surveillance of SSC Product Manufacturers and Distributors JOHN WILHOITE, AMY WILHOITE, and Alec TUNDIDOR in Georgia

55.     On January 19, 2012, a package addressed to JOHN WILHOITE, SYNERGY

BOTANICALS, 50 Barrett Parkway, Suite 3005 # 411, Marietta, Georgia, was inspected by U.S.

Customs and Border Patrol (CBP), at the UPS Hub located in Louisville, Kentucky. The

associated invoice identified the product as 285,200 "plastic packaging bags NOT FOR FOOD."

Agents believe that these plastic bags were intended for SSC packaging.

56.     On February 7, 2012, agents initiated surveillance of the UPS Store at 50 Barrett

Parkway, Suite 3005, Marietta, Georgia. At one point, agents observed a blue 2005 Infinity

FX35 SUV, GA tag BSI5982, registered to AMY Womack (WILHOITE) and JOHN

WILHOITE, of XX97 Heritage Park Circle, Kennesaw, Georgia arrive. AMY WILHOITE

23

(a/k/a Amy Womack), exited the vehicle, entered the UPS Store, then exited the store and left the area. Agents subsequently learned that AMY WILHOITE, JOHN WILHOITE's wife, had picked up 104 packages at this location between September 26, 2011, and January 25, 2012. Shipping records from the UPS Store located at 50 Barrett Parkway, Suite 3005, Marietta, GA show that SYNERGY BOTANICALS received a package at this location as recently as July 12, 2012.

57.     Approximately two hours later on February 7, 2012, agents observed a red 2006 Dodge Durango, registered to Cristine Nicole GANYARD, GA tag BNR5382, arrive at the same UPS Store at 50 Barrett Parkway, Suite 3005, Marietta, Georgia. A female, subsequently identified as Cristine Nicole GANYARD, exited and cleared out a space within the cargo area of the Durango. A male, subsequently identified as Alec TUNDIDOR, who was seated in the front passenger seat, also exited, conversed with GANYARD, and entered the UPS Store. Agents observed GANYARD re-enter the vehicle and get into the driver's seat, and they noted she appeared to be speaking into a cell phone. Agents further observed TUNDIDOR load approximately 18 boxes he took from the store into the vehicle. Agents then followed TUNDIDOR and GANYARD to XX0 Heritage Park Trace, Kennesaw, Georgia, where TUNDIDOR and GANYARD unloaded the boxes and placed them in the garage. Approximately 20 minutes later, agents observed TUNDIDOR and GANYARD leave and drive to 2397 Heritage Park Circle, the residence owned and occupied by JOHN WILHOITE and AMY WILHOITE.

58.     On February 10, 2012, agents conducted surveillance at a UPS distribution center located at 1330 Old Ellis Road, Roswell, Georgia. At that time, JOHN WILHOITE, with passenger Alec TUNDIDOR, arrived in AMY WILHOITE'S blue 2005 Infinity FX35 SUV.

24

Both JOHN WILHOITE and TUNDIDOR entered the distribution center. After a few minutes, both men exited the center while talking on their cellphones. They ended the calls, spoke briefly with each other, and went back into the UPS distribution center. Shortly afterward, the pair returned to the vehicle with 24 boxes that they loaded inside the vehicle before driving away.

59. Less than an hour later, JOHN WILHOITE and TUNDIDOR returned to the facility, and waited in the parking lot while talking on their cell phones. Approximately 16 minutes later, GANYARD's Dodge Durango pulled into the lot next to WILHOITE's vehicle. GANYARD exited and greeted WILHOITE and TUNDIDOR. TUNDIDOR then entered the UPS facility and exited with six packages that were loaded into GANYARD's vehicle. WILHOITE then drove off, and GANYARD and TUNDIDOR appeared to follow him to TUNDIDOR's residence, at X00 Heritage Park Trace, Kennesaw, Georgia. WILHOITE opened the garage, and he and TUNDIDOR unloaded packages from the respective vehicles into TUNDIDOR's garage.

60. Approximately 30 minutes later, agents observed JOHN WILHOITE carry six boxes from the garage back to his vehicle before he drove back to his own residence, at XX97 Heritage Park Circle, Kennesaw, Georgia. WILHOITE entered the residence, then exited and inspected the boxes in his vehicle. Agents observed TUNDIDOR walk over to WILHOITE's home and enter the garage, where both he and WILHOITE appeared to seal several boxes. WILHOITE and TUNDIDOR eventually drove together to a FedEx distribution facility located at 2049 Franklin Road, Marietta, Georgia. WILHOITE and TUNDIDOR unloaded six boxes from the trunk and carried them into the facility before they left the area. Agents then entered the facility, and learned that beforehand, a female employee had requested the manager, as she thought the packages WILHOITE and TUNDIDOR brought in were suspicious. The manager

25

had opened one of the packages and found that it contained what appeared to be thousands of empty foil packets with the brand name, MAKE SCENTS. The manager advised agents of what he had found, and noted further that the packages had been addressed to Brett HINTON, DS APPLICATIONS, 17093 Green Drive, City of Industry, CA 91745.

## February 2012 Surveillance of SSC Product Manufacturer and Distributor Christopher HINTON in California

61. On February 13, 2012, DEA-Atlanta notified DEA-Los Angeles regarding FedEx packages destined to be delivered to Christopher Brett HINTON, d/b/a DS APPLICATIONS, at 17093 Green Drive, City of Industry, CA, which contained suspected SSC packaging. According to utility company Southern California Edison, the utilities at this location are subscribed to Christopher HINTON, same address, and the account has been active since July 20, 2011. Agents then conducted surveillance at this address, and noted two vehicles parked there: a gray Honda Element bearing a Texas license registered to Hong Yong ZOU or Jia ZOU, of 1406 Shady Bend Drive, Sugarland, TX, as well as a silver Pontiac bearing a Georgia license plate registered to Liang Dapeng, of 585 Franklin Road SE, Suite B-3, Marietta, GA. Agents further noticed individuals exiting the warehouse location wearing dust masks around their necks.

62. At about 6:00 p.m., agents noted that the Honda Element left 17093 Green Drive with a white male driver, and an Asian female passenger. Agents followed the vehicle to a residence at 19421 La Guardia Street, Rowland Heights, CA. According Southern California Edison, the utilities at this address are subscribed to Christopher HINTON, same address, and the account was activated on July 22, 2011.

26

63. On February 14, 2012, DEA-Los Angeles continued surveillance at 17093 Green Drive, City of Industry, California. Multiple vehicles were noted on the parking lot by the building, including a red Honda Civic bearing a California license plate. According to California DMV records, this vehicle is registered to Christopher Brett HINTON. At approximately 4:15 p.m., agents observed an Asian male, believed to be Hong Yong ZOU, depart the location after carrying a box out to the parking lot. Agents followed this male to a FedEx shipping center, located at 1081 Fullerton Road, Rowland Heights, CA, where the male exited the vehicle and carried the box into the building. Agents entered the FedEx shipping center after the male left, and recovered a receipt for a FedEx Express package as well as a photocopy of the sender slip. The sender was listed as: "John" of "Packaging Inc.," 1249 S. Diamond Bar Blvd., Suite 141, Diamond Bar, CA 91765, and the recipient as "Alex Alarshi," 3407 Delaware Ave., Tonawanda, NY 14217. An open source database check revealed that there is no business named Packaging Inc. at 1249 S. Diamond Bar Blvd., but rather one called DIAMOND MAIL & SHIPPING. In addition, the phone number listed for the sender was one digit off the phone number listed at the time on the S & S WHOLESALE/WWW.BUY-HERBAL-INCENSE.COM website, which was assigned to S AND A DISTRIBUTORS, 2401 W Prien Lake Rd., Lake Charles, LA 70605, and has been active since September 7, 2010. A Lexis-Nexis Accurint report run on June 20, 2012, listed Steve SANDERS as a principal for S & A DISTRIBUTION in Lake Charles, LA, as well as a principal in S & A INVESTMENTS/U PAK IT in Lake Charles, LA.

64. Also on February 14, 2012, agents observed a male, subsequently identified through a traffic stop as Dalvas Fuselier, drive away from 17093 Green Drive, City of Industry, CA in a red Honda Civic that listed to Christopher HINTON. The vehicle was stopped in the vicinity of 19421 La Guardia Street, Rowland Heights, California for a broken tail light. Fuselier

27

identified himself and advised the deputy that he was on probation for selling marijuana in Maricopa County, AZ. Agents followed him to the residence at 19421 La Guardia Street, Rowland Heights, CA. A subsequent open source database check revealed that HINTON and Fuselier had previous addresses in Lake Charles, LA, the same city where S & S WHOLESALE and Steve SANDERS and Shane SANDERS were from, In addition, HINTON's former address on Prien Lake Road was on the same street as SANDERS' former residence.

## March 2012 Surveillance of Alec TUNDIDOR and John WILHOITE in Georgia

65. On March 6, 2012, DEA-Atlanta agents conducted a garbage pull at JOHN and AMY WILHOITE's residence at XX97 Heritage Park Circle, Kennesaw, GA. Agents found a FedEx shipping label, on a plastic bag, that listed the recipient as the Fulfillment Department of SYNERGY BOTANICALS, at 50 Barrett Parkway Suite 3005, Marietta, Georgia, with a separate UPS Store label affixed that identified the box number as box 411, the same UPS Store where AMY WILHOITE received 104 packages between September 26, 2011 and January 25, 2012. Agents also located a gray, U.S. Postal Service packaging bag that had been shipped from China with an arrival date of January 8, 2012. Finally, agents located personal mail addressed to both John and Amy WILHOITE at that address.

66. On March 29, 2012, agents established surveillance at both TUNDIDOR's residence, XX0 Heritage Park Trace and the WILHOITES' residence XX97 Heritage Park Circle. Agents observed a burgundy Ford Focus bearing a Georgia license plate pull up to XX97 Heritage Park Circle, with an unknown female driver and male passenger, and TUNDIDOR in the rear passenger seat. TUNDIDOR entered the WILHOITES' residence and retrieved two FedEx boxes, which he carried out to the car. The car then left the WILHOITES' residence and

28

was later observed unoccupied at TUNDIDOR's residence, at XX0 Heritage Park Trace. Agents then noticed the vehicle returned to the WILHOITES' residence, where TUNDIDOR exited the vehicle, entered the residence for a brief time, and then re-entered the vehicle. Ultimately, agents followed the vehicle to a FedEx store at 38 Barrett Parkway, Marietta, GA, where they observed TUNDIDOR exit and carry a FedEx box inside the business. After TUNDIDOR left, agents made contact with the store manager and found that the sender information for the package that TUNDIDOR had dropped off was listed as PURITY BROKERS, XX35 Old 41 Hwy., Suite 112-304, Kennesaw, GA. According to Georgia state records, PURITY BROKERS was registered as a limited liability company in the State of Georgia on July 29, 2010, with a listed agent of Grizzell TUNDIDOR, of 1210 Thistle Gate Path, Lawrenceville, GA. Grizzell TUNDIDOR is the mother of Alec TUNDIDOR.

67.    Agents then followed the Ford Focus to a business complex, where it parked in front of 206C Marray Drive, Chamblee, GA. The unknown female then exited the car and entered the business. TUNDIDOR then exited the passenger side of the vehicle and carried a black satchel bag and a white padded envelope into the business. TUNDIDOR and the unknown male exited the building about 30 minutes later, and entered a blue Mercedes and departed the location. The unknown male was identified through a traffic stop conducted in a Lowe's store parking lot as Justin Morse. After the traffic stop had concluded, Morse and TUNDIDOR entered Lowe's and purchased six containers of acetone. Through my training and experience, I know that acetone is frequently used to produce SSCs, and specifically, to dilute the synthetic cannabinoid compound for mixing with Damiana leaves or some other carrier medium.

29

**March 2012 Seizure of G-13 SSC Product in Milwaukee, Wisconsin**

68.    On March 30, 2012, officers with the West Allis, Wisconsin, Police Department executed a search warrant at a gas station and convenience store at 3061 South 108th Street. Some of the SSCs seized at the location were the G-13 brand, which were recognized from the packaging and know to be manufactured and/or distributed by S & S WHOLESALE LLC/DEEP SOUTH INCENSE/DEVRAJ WHOLESALE/DS APPLICATIONS.

**March to May 2012 Undercover Attempts to Purchase SSC Product**

69.    On April 2, 2012, while acting in an undercover capacity, I attempted to call Steve SANDERS at the phone number posted on the website for MR. HAPPY products (WWW.BUY-HERBAL-INCENSE.COM), in order to place an order for SSCs. I received a voicemail message identifying the recipient as "Steve," but was unable to leave a voicemail as the message box was full. I also went on the website and sent a request for information in the "Contact Us" section, but received no reply to that request.

70.    On May 8, 2012, I checked the BUY-HERBAL-INCENSE.COM website and found that the website's appearance had changed in that the contact number was different and the "S & S WHOLESALE LLC" and "DEEP SOUTH INCENSE LLC" names that had previously appeared on the bottom of the website page had been removed. While acting in an undercover capacity, I called the new number and spoke with a male who identified himself as "Alex," whom I later identified to be Alex TUNDIDOR through his website and email address. "Alex" and I discussed the purchase of SSC product. But TUNDIDOR would not send samples and would not sell me less than 500 pieces at $5.50 each. TUNDIDOR identified his business as a manufacturer and said there are minimums but that he could sell a few as 500 pieces, for which

30

he would give me a 1,000 piece price. Regarding brands, TUNDIDOR told me that G-20 is "a step up" from G-13, in that it is stronger. I told TUNDIDOR that I would have to talk to my business partner regarding that purchase, and that I had made purchases from Mr. Nice Guy and Revolution Distribution. TUNDIDOR replied that he knew all those people, and gave me his cell phone number to contact him at in the future.

71.     On May 15, 2012, TUNDIDOR sent a text to my undercover cell phone and asked if I had talked to my partner yet. I called TUNDIDOR back, and we talked about a prospective purchase. TUNDIDOR told me that he had just landed in Los Angeles and was out there "to take a look at everything." TUNDIDOR provided me with his email address, AN056@BROTHERSWHOLESALE.NET, so that I could email him and request a sample of their Kratom product. TUNDIDOR also stated that he had staffed a booth at C.H.A.M.P.S. East last year for his company, SYNERGY BOTANICALS. TUNDIDIR and I agreed to try to meet at the C.H.A.M.P.S. East Trade Show in Atlantic City, New Jersey, the following week if we both attended. I remained in contact with TUNDIDOR via text messages.

72.     A Google search of "SYNERGY BOTANICALS" revealed that the company is being sued in the Central District of California, case number SACV-11-00852 JST. A PACER check preliminarily identified "Alex" as Alec Nicholas TUNDIDOR and his partner, "John," as John Curtis WILHOITE, both of whom are known to be national SSC distributors. Court documents filed in that case link 6 DEGREES MARKETING to SYNERGY BOTANICALS. 6 DEGREES MARKETING LLC is registered in the State of Georgia, and the address listed for the business is JOHN WILHOITE's home address: XX97 Heritage Park Circle, Kennesaw, Georgia. SYNERGY BOTANICALS is registered in the State of Wyoming but is registered with 6 DEGREES MARKETING as its proxy agent, and the business address listed is a mailbox.

31

**May 2012 Surveillance of DS Applications in California**

73.    On May 22, 2012, DEA-Los Angeles agents conducted vehicle and foot surveillance at DS APPLICATIONS at 17093 Green Drive, City of Industry, CA. The north-facing exterior door and the south roll-up door were open, and agents saw multiple clear or white colored plastic bags containing suspected SSC product, as well as between 10-15 Asian females wearing masks, seated at a table packaging the product. The packaging had a picture of a happy face on it. One of the agents noticed a distinct odor in the warehouse and saw a pile of green, leafy substance on a table, with an Asian male, subsequently identified as Hong Yong ZOU, cutting up the substance. The agent asked ZOU where the sign shop was located and ZOU replied that it was across the street. ZOU referred to the business as J & B APPLICATIONS.

74.    At about 5:00 p.m., agents observed Hong Yong ZOU carry large brown boxes from the warehouse and load them into the rear of a gray and blue Honda Element with a Texas license plate. Agents also observed a large box being loaded into a red Honda Civic bearing a California license, registered to HINTON but operated by a male identified as Dalvas Fuselier. Agents followed ZOU and Fuselier to the FedEx Print & Ship Center, located at 18218 E. Gale Avenue, City of Industry, California, where ZOU and Fuselier dropped off the large boxes. Agents subsequently took custody of the boxes and obtained a state search warrant for them. The boxes contained approximately 11,000 packets of G-13, Dank, Mr. Happy, G-20, and Mr. Nice Guy SSC product. The recipient for these boxes was listed as Dev PATEL, SUPER WHOLESALE, 1200 Woodruff Rd., Ste. A1, Greenville, South Carolina. The sender was listed as "John" from PACKAGING INC, 1249 S. Diamond Bar Blvd., Suite 141, Diamond Bar, California. The DEA Southwest Lab conducted preliminary analysis on these seized products and found that they contained a combination of 1-Pentyl-3-(2,2,3,3-

32

tetramethylcyclopropoyl)indole (UR-144), and 1-(5-Fluoropentyl)-3-(2,2,3,3-

tetramethylcyclopropoyl)indole (XLR-11, also known as 5FUR-144), which DEA considers to

be controlled substance analogues of the Schedule I controlled substance JWH-018. The lab is

awaiting standards for further analysis before issuing a final report.

## Toll Records Linking Dev PATEL, Christopher HINTON, and JOHN WILHOITE

75.     Toll records analysis revealed that Dev PATEL of DEVRAJ WHOLESALE was

in contact with Alec TUNDIDOR, as well as with Christopher Brett HINTON. PATEL was in

contact with TUNDIDOR's phone approximately 51 times between May 22, 2012, and June 20,

2012. PATEL was in contact with HINTON's phone approximately 22 times during that same

date range.

76.     Toll records analysis further showed that TUNDIDOR's and HINTON's phones

are also in contact S & A DISTRIBUTORS, 4820 Bellrive Lane, Lake Charles, LA. The original

phone number listed on the BUY-HERBAL-INCENSE.COM website, which, according to tolls,

was contacted regularly by Bassam Abu-Shawish, was also subscribed to S & A

DISTRIBUTORS, but at Steve and Shane SANDERS' former address: 2401 W. Prien Lake Rd.,

Lake Charles, LA. A Lexis-Nexis Accurint report run on June 20, 2012 listed Steve SANDERS

as a principal for S & A DISTRIBUTION in Lake Charles, LA, as well as a principal in S & A

INVESTMENTS/U PAK IT in Lake Charles, LA, and Calcascieu Parish Assessor's Office

records list Steve SANDERS as being the recipient/owner of both properties at the time 2011

property tax statements were issued. Lexis-Nexis further indicated that the address on Bellrive

Lane is Steve SANDERS' current home address.

Case 2:13-mj-00226-PJG   Filed 06/13/13   Page 33 of 53   Document 1-1

77.     Toll analysis also revealed the extent to which HINTON has been in contact with TUNDIDOR and WILHOITE. TUNDIDOR's and HINTON's phones were in contact approximately 488 times between May 28, 2012, and June 27, 2012. WILHOITE's and HINTON's phones were in contact approximately 128 times between May 30, 2012, and June 27, 2012.

**May 2012 C.H.A.M.P.S. East Trade Show**

78.     On May 23, 2012, I, acting an undercover capacity, traveled to the Atlantic City Convention Center in Atlantic City, NJ to attend the C.H.A.M.P.S. East Trade Show, a business-to-business wholesale trade show for industries involved in contemporary smoking products and affiliated products, including SSCs. On that date, I met with Alec TUNDIDOR, who said he wanted to introduce me to his partner "John" (identified from photos as John WILHOITE). TUNDIDOR, WILHOITE, and I walked to an area where tables and chairs were set up to discuss the purchase of 1,000 pieces of SSC product for $5,000 USC from their business, BROTHERS WHOLESALE. TUNDIDOR took the following order and showed it to me on his phone: 250 Atomic 4 gram, 250 California Dreams 4 gram, 250 Dank 4 gram, and 250 G-20 4 gram.

79.     I asked TUNDIDOR what was in the products, referring to SSC compounds, and referred to Illinois laws regarding analogues and homologues. TUNDIDOR did not answer, but told me that I will get lab reports. TUNDIDOR proceeded to send an AI Biotech lab report to my undercover email from **brotherswholesaleorders@gmail.com**. That AI Biotech "does not contain" report is dated May 14, 2012, and the entity that submitted the samples for testing is listed as DS APPLICATIONS, 17093 Green Dr., City of Industry, CA 91745. The lab report is

34

for a seven sample blends that included the brand names: Mr. Happy, Mr. Nice Guy, California Dreams, G-20, G-13, Atomic, and Dank.

80.     JOHN WILHOITE also sent me an invoice via QuickBooks Online from his iPad and email, **brotherswsorders@gmail.com**, which specified that payment could be made via wire transfer or cash deposits into JPMorgan Chase Bank, NA, Credit to: Brothers Wholesale, or Bank of America, NA, Credit to: Brothers Wholesale. The invoice listed BROTHERS WHOLESALE's address as 26XX Piedmont Road Ste 56-271, Atlanta, GA, and the phone number was the same new contact number for Mr. Happy products on the BUY-HERBAL-INCENSE.COM and the number I had called on May 8, 2012.

81.     Records reveal the QuickBooks Online account where the invoice from **brotherswsorders@gmail.com** originated is owned by Brothers Wholesale, 26XX Piedmont Road, Suite #56-271, Atlanta, GA 30324. The account information lists the company e-mail address as **brotherswsfinance@gmail.com**. AMY and/or JOHN WILHOITE also used the **brotherswsfinance@gmail.com** address to communicate with others about various BROTHERS WHOLESALE business matters, such as the quantity of SSC packets sold and the amount of compensation due STEVE SANDERS, and to send and receive invoices.

82.     As my meeting with TUNDIDOR and WILHOITE concluded, WILHOITE and I walked together to retrieve WILHOITE's cell phone, which was charging at a different exhibit booth. WILHOITE stated that most people there (other manufacturers and distributors at C.H.A.M.P.S.) know them by the business name SYNERGY BOTANICALS, but they have several different companies within their company. I asked about an attorney letter, and WILHOITE told me about the attorneys they use, and said their attorneys submit the samples to the labs for testing on behalf of their clients, so if the lab records are subpoenaed or if police get

35

a copy of a lab report, they would have to go back to the attorneys to find out any information and the client would be protected. WILHOITE also claimed that their attorneys had a background in chemistry. WILHOITE sent an email to me which contained the email address of his attorney: SPENCER_ESQ@YAHOO.COM. A search of the attorney's email using Google revealed that the email is associated with Boca Raton, Florida-based attorney Spencer Bryant Siegel, an attorney at Siegel, Siegel & Wright, which operates a website called www.insenselaw.com.

83.     I am aware that attorneys exhibit at and attend the trade shows frequented by manufacturers and distributors of SSCs, and further advertise in counter-culture magazines used by them, in order to meet and introduce new clients to their business. For example, www.insenselaw.com offers its SSC clients anonymity from law enforcement by submitting samples of SSC products to labs for analysis on their client's behalf. I know that some manufacturers also provide attorney letters regarding the attorney's opinion as to the conformity with state laws where the product is sold. I have seen letters address state analogue and homologue laws, but I have never seen an attorney letter that renders an opinion on or even references federal laws such as the Controlled Substance Analogue Enforcement Act of 1986.

## May 2012 Seizure of SSC Product in Milwaukee, Wisconsin

84.     On May 23, 2012, Milwaukee Police Department officers conducted an inspection at Cigarette Depot located at 27XX North 76th Street in the City of Milwaukee, Milwaukee County, which is in the Eastern District of Wisconsin. Officers seized various SSCs from the store, which included SSCs under the brand names California Dreams and Dank. I

36

know these brands are manufactured and distributed by DS APPLICATIONS/SYNERGY BOTANICALS.

## May to June 2012 Shipment of SSC Product to Milwaukee, Wisconsin from JOHN WILHOITE, Alec TUNDIDOR, and Christopher HINTON

85. On May 24, 2012, I received an email from **brotherswsorders@gmail.com**, the email address that John WILHOITE had used in my presence to send an invoice to my undercover email at C.H.A.M.P.S. East. The email stated that "John" of PACKAGING INC had sent me a shipment via FedEx, scheduled to be sent on May 23, 2012, and the COD amount due at delivery was $5,176.07.

86. On June 1, 2012, I checked the status of the shipment and found that the package had been picked up on May 23, 2012, in City of Industry, California. Future delivery was requested on May 25, 2012 (by TUNDIDOR), and again on May 29, 2012 (by me). On June 1, 2012, I also found out that an attempt to deliver the package had been made on that date but was noted on the FedEx tracking site "Customer was not available or the business was closed." On June 4, 2012, I called FedEx to find out what the status of the shipment was and was told that the package had been sent back to the shipper, as the shipper had called FedEx to request it be returned. On June 4, 2012, I texted TUNDIDOR and requested that TUNDIDOR check on the status of the shipment.

87. Later that date, a male who identified himself to me as "Brett" (subsequently identified as Christopher "Brett" HINTON) called my undercover cell phone and stated that he was partners in BROTHERS WHOLESALE with Alec (TUNDIDOR) and John (WILHOITE). HINTON apologized for the mix-up and told me that his partner was Chinese, and his partner's parents managed his business. HINTON added that their limited ability to understand English

37

caused the mix-up and he would rectify it. HINTON told me that he would ship my order and told me to call him directly if there were any special directions for the order, and he would make sure the shipments were correct. I asked HINTON what was in the product, and explained that 2201 (AM2201) goes well in this area, but I wanted to make sure s/he didn't get "hung up." HINTON stated that he just had lunch with his attorney today and assured me they are careful. Regarding what was in it, HINTON replied that he preferred I ask Alec (TUNDIDOR). I sent a text message to TUNDIDOR after the call with HINTON, to let TUNDIDOR know that HINTON had just called and to thank him for helping.

88.    Toll records for TUNDIDOR's and HINTON's cell phones reveal that TUNDIDOR had called HINTON on June 4, 2012, about 14 minutes after TUNDIDOR had sent his last reply to me regarding my text to him about the problem with the order. HINTON then called TUNDIDOR twice before he called me back.

89.    On June 6, 2012, HINTON called my undercover cell phone and left a voice mail message stating the order would be shipped the following day, and also sent text messages again apologizing for the mix-up. In this message, HINTON identified himself as "Brett HINTON" with JB PACKAGING and asked me to call him back.

90.    Corporate registration records for DS APPLICATIONS LLC, the name of the business on the lab report that TUNDIDOR sent to me via email on May 23, 2012, lists Jia ZOU as the director of that company. According to law enforcement databases, DS APPLICATIONS shares a common address with J & B PACKAGING, the business name HINTON had left on his voicemail message for me on June 6, 2012, when HINTON had called me to confirm the re-shipment of the order that I had placed with BROTHERS WHOLESALE on May 23. That

38

common address of both DS APPLICATIONS and J & B PACKAGING is 17093 Green Drive, City of Industry, California.

91.     On June 7, 2012, agents received the order I had placed in-person with TUNDIDOR and WILHOITE at the undercover mail box in West Allis, Wisconsin. The order was paid for using USPS money orders, which were subsequently endorsed by TUNDIDOR and may have been negotiated against the BROTHERS WHOLESALE Bank of America account. According to FedEx records, the shipment was picked up in City of Industry, CA on June 6, 2012. According to the shipping label on the box, the sender was listed as "John" from PACKAGING INC., with a sender address of 1249 S. Diamond Bar Blvd., Suite 141, Diamond Bar, CA 91765. The phone number listed for the sender was subscribed to HINTON, and the other phone number listed on the label was the same one then displayed on the MR. HAPPY website, WWW.BUY-HERBAL-INCENSE.COM, and the same one that UC1 had used to originally contact TUNDIDOR on May 8, 2012. In addition, the invoice number corresponded with the invoice sent to my undercover email by John WILHOITE on May 23, 2012.

92.     On June 27, 2012, the DEA North Central Lab a sample of the products delivered on June 7, 2012, and found that they contained a blend of 1-Pentyl-3-(2,2,3,3-tetramethylcyclopropoyl)indole (UR-144) and 1-(5-Fluoropentyl)-3-(2,2,3,3-tetramethylcyclopropoyl)indole (XLR-11, otherwise known as 5FUR-144), which are considered analogues of the schedule I controlled substance, JWH-018. These results are consistent with the preliminary analysis results the DEA Southwest Lab obtained when they analyzed the DEA - Los Angeles seizure of product that was shipped to Dev PATEL on May 22, 2012.

39

**July 2012 Order of SSC Product from Alec TUNDIDOR**

93.    On July 10, 2012, I called Alec TUNDIDOR d/b/a BROTHERS WHOLESALE to place an order for $5,000 (1,000 pieces) of SSC product. I told TUNDIDOR that I wanted to place another order, but added that I had emailed WILHOITE regarding the ramifications of the new federal incense law and had not heard back from him. TUNDIDOR told me, "We're fine . . . we're good." TUNDIDOR told me they have a few new products and have changed all of their packaging. TUNDIDOR also told me they have a new air freshener line, Kool Breeze and Tropical Breeze. I asked how one best used the "air fresheners," and TUNDIDOR replied, "the same way that they want to use a botanical sachet or . . . ." I laughed, and TUNDIDOR said, "Yeah, yeah. Just a different presentation." TUNDIDOR said he would send me some samples, and then received a call on another phone. TUNDIDOR returned to speaking with me and stated, "It's Brett out at the warehouse. He is just too much man!" TUNDIDOR also told me about their new product, Guerilla Warfare, with camouflage lettering and a picture of Che Guevara on it. I told TUNDIDOR that I was looking to spend $5,000 even for 1,000 pieces of product. TUNDIDOR asked how I was going to pay. I replied money orders, unless he had a bank account he wanted me to make a cash deposit on. TUNDIDOR agreed and said that their account information would be in the email. TUNDIDOR asked me to email the order to him at an056@brotherswholesale.net.

94.    On July 10, 2012, I received an email from **brotherswsorders@gmail.com**. The email contained an invoice again delivered by QuickBooks Online. The order was in the amount of $5,000, for which UC1 would receive 250 pieces of Dank 4g packets; 250 pieces of Atomic 4g packets; 250 pieces of California Dreams 4g packets; 250 pieces of Tiger Shark 4g packets;

40

and samples of Kool Breeze 2g packets, Tropical Breeze 2g packets, and Guerilla Warfare 1g packets.

**July 2012 Trash pull at 206C Marray Drive, Chamblee, Georgia**

95.     On July 11, 2012, agents deposited $5,000 into the JP Morgan Chase back account provided in the email of July 10, 2012, for BROTHERS WHOLESALE, and I followed up with texts to both TUNDIDOR's and HINTON's cell phones.

96.     On July 20, 2012, members of DEA/Atlanta HIDTA Group 3 conducted a trash pull at 206C Marray Drive, Atlanta, GA. Located during the trash pull was a Norman International cardboard box that had attached to it multiple labels addressed to CHEMDUSTRY LLC at 206C Marray Drive, Atlanta, Georgia, shipped from Tasty Puff LLC at 10005 Acoma Road Southeast, Suite A, Albuquerque, New Mexico. One of the labels was a Flammable Liquid label and a white label that had "Extracts, flavoring, liquid UN1197" printed on it. Also obtained from the trash pull was an invoice dated June 26, 2012 from Tasty Puff to CHEMDUSTRY at 206 Marray Drive, Suite C, Atlanta, GA 30341, showing a shipment of a gallon of Blueberry Thrill with the price of $350.00. I know that Tasty Puff flavoring is typically used in the manufacture of SSCs.

97.     According to State of Georgia corporation filings, CHEMDUSTRY was registered as a limited liability company on March 5, 2012. CHEMDUSTRY's business address is listed as 2625 Piedmont Road, Suite 56-271, Atlanta, Georgia, which is the same address BROTHERS WHOLESALE, TUNDIDOR and WILHOITE listed on the purchase invoices sent to UC1 in May 2012 and July 2012.

41

98.     Financial records belonging to BROTHERS WHOLESALE were obtained in the course of this investigation from Intuit, the host of the accounting software service, Quickbooks Online. The "Income List" obtained from Intuit is a detailed listing of BROTHERS WHOLESALE's sales invoices from on or about March 12, 2012, through July 17, 2012. Entries on this income list indicate that sales totaling $395,500 were made to a single customer named "SUPER WHOLESALE." On May 22, 2012, DEA-Los Angeles agents observed individuals transport boxes from the DS APPLICATIONS/J & B PACKAGING address of 17093 Green Drive, City of Industry, California to a FedEx store. Agents subsequently took custody of the boxes and obtained a state search warrant for them. The boxes contained approximately 11,000 packets of G-13, Dank, Mr. Happy, G-20, and Mr. Nice Guy SSC product. The recipient for these boxes was listed as Dev PATEL, SUPER WHOLESALE, 1200 Woodruff Rd., Ste. A1, Greenville, South Carolina. This is a shared address with DEVRAJ WHOLESALE, which was registered in the State of South Carolina on December 1, 2011 by Divyesh PATEL, with a business address of 1200 Woodruff Road, Suite A1, Greenville, South Carolina. Records for UPS account #51W7A4, which was listed on each of the shipping labels containing Mr. Happy brands of SSC product shipped to Abu-Shawish, show that the account was opened on January 24, 2012 by Josh PATEL of 361 Meeler Circle, Bogart, GA 30622. According to UPS records, this same account number was opened on February 17, 2010, by SUPER WHOLESALE, at that same address in Bogart, GA. The President/CEO listed in UPS records for SUPER WHOLESALE was Raj DHARMENDRA.

99.     Toll records analysis revealed that Dev PATEL of DEVRAJ WHOLESALE a/k/a SUPER WHOLESALE was in contact with Alec TUNDIDOR, as well as with Christopher Brett HINTON. PATEL was in contact with TUNDIDOR's phone approximately 51 times between

42

May 22, 2012 and June 20, 2012. PATEL was in contact with HINTON's phone approximately 22 times during that same period. Toll records analysis further showed that TUNDIDOR's and HINTON's phones are also in contact with a phone number subscribed to S & A DISTRIBUTORS, 4820 Bellrive Lane, Lake Charles, Louisiana, which is Steve SANDERS' home address.

100. CHEMDUSTRY was originally registered in Wyoming with ALEC NICHOLAS CONSULTING listed as a proxy agent along with 6 DEGREES MARKETING. ALEC NICHOLAS CONSULTING was originally registered in Georgia with Alec TUNDIDOR listed as the managing member. CHEMDUSTRY shares a current address with BROTHERS WHOLESALE (SUSPECT PREMISES 3; 26XX Piedmont Road, Suite 56 #271, Atlanta, GA).

101. Records reveal that ALEC NICHOLAS CONSULTING, LLC, was incorporated on March 2, 2010, and was the first of at least eight (8) business entities established by Alec N. TUNDIDOR and/or JOHN WILHOITE between March 2010 and March 2012. According to articles of incorporation, ALEC NICHOLAS CONSULTING, LLC, is listed as a corporate member of SYNERGY BOTANICALS CO., LLC. ALEC NICHOLAS CONSULTING, LLC, lists the e-mail address **puritybrokers@gmail.com** as the contact e-mail on the articles of incorporation for SYNERGY BOTANICALS CO., LLC. JOHN WILHOITE also used the **puritybrokers@gmail.com** e-mail address to communicate with me on May 23, 2012, when I was acting in an undercover capacity, to refer me to S.S., an attorney with incenselaw.com. AMY and/or JOHN WILHOITE also used the **puritybrokers@gmail.com** e-mail address to communicate with SSC manufacturers regarding those manufacturers' purchases of SC compounds from PURITY BROKERS.

43

102.     Records for UPS account, #51W7A4, which was listed on each of the shipping labels containing MR. HAPPY brands of SSC product shipped to Abu-Shawish, reveal this UPS account was opened on 01-24-2012 by Josh Patel of 361 Meeler Circle, Bogart, GA 30622; Phone: 404-694-0640; Email **devrajwholesale@gmail.com**. According to records, this same account number was opened on 02-17-2010 by SUPER WHOLESALE, at that same address in Bogart, GA. The President/CEO listed in UPS records for SUPER WHOLSALE was Raj DHARMENDRA; Phone: 404-275-0739; Email: **dharma65@gmail.com.**

**Usage of email addresses in furtherance of the conspiracy**

103.     I submit that there exists probable cause to believe that evidence regarding the suspected conspiracy involving John Wilhoite, Amy Wilhoite, Alec Tundidor, "Brett" Hinton, Jia Zou, Steve Sanders, Shane Sanders, Dev Patel, and others, to manufacture and distribute SSC products containing analogues of Schedule I controlled substance JWH-18 can be found in information associated with the following email accounts maintained by Google, Inc.:

- **brotherwholesaleorders@gmail.com**
- **brotherswsorders@gmail.com,**
- **brotherswsfinance@gmail.com,**
- **puritybrokers@gmail.com,**
- **devrajwholesale@gmail.com, and**
- **dharma65@gmail.com,**

because, as noted in paragraphs 79, 80, 81, 85, 94, 101, 102 above, one or more members of the suspected conspiracy used each of the above addresses in furtherance of or in connection with the suspected conspiracy.

44

**Preservation letters to Google regarding email accounts**

104.    On the dates listed in the below chart preservation letters were sent to Google, Inc. Each preservation letter and any subsequent extension letter were good for a period of ninety (90) days.

| Email Address | Initial | Extension | Extension |
|---|---|---|---|
| PURITYBROKERS@GMAIL.COM | 7/6/2012 | 10/5/2012 | 1/3/2013 |
| BROTHERSWSFINANCE@GMAIL.COM | 7/17/2012 | 10/5/2012 | 1/3/2013 |
| BROTHERSWSORDERS@GMAIL.COM | 7/6/2012 | 10/5/2012 | 1/3/2013 |
| DEVRAJWHOLESALE@GMAIL.COM | 7/6/2012 | 10/5/2012 | 1/3/2013 |
| DHARMA65@GMAIL.COM | 7/6/2012 | 10/5/2012 | 1/3/2013 |
| BROTHERSWHOLESALEORDERS@GMAIL.COM | 7/6/2012 | | 1/3/2013 |

**Google's storage and retention of email messages**

105.    In general, an e-mail that is sent to a Google, Inc. subscriber is stored in the subscriber's "mail box" on Google, Inc. servers until the subscriber deletes the e-mail. If the subscriber does not delete the message, the message can remain on Google, Inc. servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to be available on Google, Inc.'s servers for a certain period of time.

106.    In my training and experience, I have learned that Google, Inc. provides a variety of on-line services, including electronic mail ("e-mail") access, to the general public. Google, Inc. allows subscribers to obtain e-mail accounts at the domain name gmail.com, like the e-mail accounts listed in Attachment A. Subscribers obtain an account by registering with Google, Inc. During the registration process, Google, Inc. asks subscribers to provide basic personal information. Therefore, the computers of Google, Inc. are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for Google, Inc. subscribers) and information concerning subscribers and their use of Google, Inc. services, such as account access

45

information, e-mail transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

107. When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via the Internet to Google, Inc.'s servers, and then transmitted to its end destination. Google, Inc. often saves a copy of the e-mail sent. Unless the sender of the e-mail specifically deletes the e-mail from the Google, Inc. server, the e-mail can remain on the system indefinitely. Even if the sender deletes the e-mail, it may continue to be available on Google, Inc.'s servers for a certain period of time.

108. A sent or received e-mail typically includes the content of the message, source and destination addresses, the date and time at which the e-mail was sent, and the size and length of the e-mail. If an e-mail user writes a draft message but does not send it, that message may also be saved by Google, Inc. but may not include all of these categories of data.

109. A Google, Inc. subscriber can also store files, including e-mails, address books, contact or buddy lists, calendar data, pictures, and other files, on servers maintained and/or owned by Google, Inc.

110. Subscribers to Google, Inc. might not store on their home computers copies of the e-mails stored in their Google, Inc. account. This is particularly true when they access their Google, Inc. account through the web, or if they do not wish to maintain particular e-mails or files in their residence.

111. In general, e-mail providers like Google, Inc. ask each of their subscribers to provide certain personal identifying information when registering for an e-mail account. This information can include the subscriber's full name, physical address, telephone numbers and

46

other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).

112. E-mail providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google, Inc.'s website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

113. In some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

114. In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

47

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

115.    I anticipate executing this warrant under the Electronic Communications Privacy

Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant

to require Google, Inc. to disclose to the United States copies of the records and other

information (including the content of communications) particularly described in Section I of

Attachment B. Upon receipt of the information described in Section I of Attachment B,

government-authorized persons will review that information to locate the items described in

Section II of Attachment B.

## CONCLUSION

116.    Based on the forgoing, I request that the Court issue the proposed search warrants

for the following accounts:

- **brotherwholesaleorders@gmail.com**

- **brotherswsorders@gmail.com,**

- **brotherswsfinance@gmail.com,**

- **puritybrokers@gmail.com,**

- **devrajwholesale@gmail.com, and**

- **dharma65@gmail.com,**

117.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not

required for the service or execution of this warrant.

118.    Because the warrant will be served on by Google, Inc., which will then compile

the requested records at a time convenient to it, there exists reasonable cause to permit the

execution of the requested warrant at any time in the day or night.

48



## ATTACHMENT B

### Particular Things to be Seized

## I. Information to be disclosed by Google, Inc.

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, Inc., including any emails, records, files, logs, or information that have been deleted but are still available to Google, Inc., or have been preserved pursuant to requests made under 18 U.S.C. § 2703(f), Google, Inc. is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.     The contents of all e-mails associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b.     All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.     the types of service utilized;

d.     All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.     All records pertaining to communications between Google, Inc. and any person regarding the account, including contacts with support services and records of actions taken.

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 21 U.S.C. §§ 841, 846, 813 (possession with intent to distribute a controlled substance, conspiracy to distribute a controlled substance, controlled substance analogues) 21 U.S.C. § 331 (introduction or delivery into interstate commerce of any drug that is adulterated or misbranded), and 18 U.S.C. § 1956 (money laundering by conducting financial transactions to promote, or conceal the proceeds of, illegal narcotics activity) involving each account or identifier listed on Attachment A, from the opening of the account to the present, information pertaining to the following matters:

a.     All communications or correspondence, including any attachments, regarding:

1.     any chemistry issues relating to synthetic cannabanoid ("SC") compounds, including the formulation, reformulation, and/or contents of SC compounds; "does contain" reports; "does not contain" reports; physiological and/or pharmacological effects of any SC compound or compounds if ingested;

2.     intended uses of SC compounds;

3.     the scheduling or proposed scheduling of SC compounds by any level of government in the United States;

2

4. whether an SC compound is an analogue of a Schedule I controlled substance;

5. SC suppliers, travel to meet with SC suppliers, and/or purchasing SC compounds or other supplies for manufacturing SC compounds or smokable synthetic cannabanoid ("SSC") products;

6. distribution, sales, and/or shipment of SC compounds or SSC products;

7. any aspect of the operation of any business, entity, partnership, or conspiracy associated with the manufacturing, distribution, or sales of SC compounds or SSC products, including formation or dissolution, the entry into agreements or conspiracies, membership in or employment issues, business expenditures, sales, business profits, distribution of profits, and purchases;

8. unlawful distribution of controlled substances or their analogues synthetic cannabinoids, facilitated by the email addresses in attachment A.

b. All communications or correspondence, including any attachments, regarding:

1. expenditures of any monies, including proceeds of the sale of SC compounds and/or SSC products; and

2. bank, investment, or financial accounts, safe deposit boxes, or financial transactions of any kind, including bank statements and related records,

3

passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys;

3. the obtaining, secreting, transfer, concealment and/or expenditure of money; and/or

4. the obtaining, secreting, transfer, and/or concealment of assets.

c. Records relating to who created, used, or communicated with the account or identifier, including records about their identities and whereabouts.

4